**LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF the CITY OF JOPLIN, Missouri, a public corporation, Plaintiff-Respondent,**

v.

**JOPLIN UNION DEPOT COMPANY, a corporation, Defendant-Appellant.**

**No. 8720.**

Springfield Court of Appeals.
Missouri.

June 10, 1968.

Lloyd R. Buehner, Joplin, Robert D. Youle, Kansas City, for defendant-appellant; Buehner & Thomas, Joplin, Lathrop,

Righter, Gordon & Parker, Kansas City, of Counsel.

Roberts & Fleischaker, Loyd E. Roberts, Joplin, for plaintiff-respondent.

STONE, Judge.

In this proceeding Land Clearance for Redevelopment Authority of the City of Joplin, Missouri (hereinafter referred to as the Authority), a public corporation organized under the Land Clearance for Redevelopment Authority Law [V.A.M.S. §§ 99.300 to 99.660], has exercised its power of eminent domain [V.A.M.S. §§ 99.420(4) and 99.460], in connection with the Progress Urban Renewal Project in Joplin, to condemn Lots 151 and 152 and one-half of the vacated alley at the rear of those lots in Porter's Addition (referred to upon trial as, and hereinafter called, *the subject lots*), which were owned by defendant Joplin Union Depot Company, a corporation (referred to upon trial as, and hereinafter called, *JUD*). The commissioners awarded $2,250 to JUD, and the Authority paid that sum into the registry of the court on May 12, 1964, which thereby became the date of taking. V.A.M.R. 86.06; V.A.M.S. § 523.-040; State ex rel. State Highway Commission v. Harris, Mo.App., 417 S.W.2d 29, 31(3). After the filing of JUD's exceptions to the commissioners' report [V.A.M.R. 86.08; V.A.M.S. § 523.050], the proceeding lay dormant on the docket until a jury trial was had on April 24 and 25, 1967, which terminated in a verdict for $5,000 upon which judgment was entered for JUD in the principal sum of $2,750 (after deducting the Authority's previous payment of $2,250) with interest thereon in the sum of $482 [V.A.M.R. 86.10; V.A.M.S. § 523.045], or in the aggregate amount of $3,232. Thereafter, to wit, on June 9, 1967, the Authority's timely motion for new trial was sustained "on the grounds that the verdict of the jury is excessive and against the weight of the evidence." JUD appeals.

Under "points relied on," JUD asserts that the trial court "erred and abused its discretion" in granting a new trial in that (a) "the verdict and judgment below was not contrary to, but rather was clearly supported by, the preponderance and weight of the substantial, credible and probative evidence in the cause" and (b) "there was no substantial or prejudicial misconduct and arguments by [JUD's] attorneys at the trial which could or did affect the jury or the result and its verdict in the case, nor was any proper and timely objection made thereto or exception saved thereon." We treat of these in inverse order, as appears to be more appropriate.

◼ *Of (b).* The disavowal of "substantial or prejudicial misconduct and arguments" by JUD's attorneys was prompted by the trial court's "memorandum opinion," in which he expressed the view "that other matters were injected into the trial of this case and undoubtedly affected the jury which should not have been brought before the jury" and, after commenting about those "other matters," concluded "that the general attitude developed in connection with the trial of this case did not result in a fair and proper determination of the value of the property involved and for that reason in addition to the reasons first stated, the court feels that plaintiff [the Authority] is entitled to a new trial." In sustaining a motion for new trial, the court is required to "specify of record the ground or grounds on which said new trial is granted" [V.A.M.R. 78.01; V.A.M.S. § 510.330], and the reported decisions leave no room for doubt but that the trial court's order is the sole official repository for the court's grounds, thoughts or reasons for sustention of the motion for new trial.[1] If that order is ambiguous, uncertain or incomplete, the

---

1. State ex rel. State Highway Com'n. v. Vaught, Mo., 400 S.W.2d 153, 154; Bierman v. Langston, Mo., 304 S.W.2d 865, 867(1); Hammond v. Crown Coach Co., 364 Mo. 508, 513, 263 S.W.2d 362, 364–365; Donati v. Gualdoni, 358 Mo. 667, 216 S.W.2d 519, 521(3); Sawyer v. Winterholder, Mo., 195 S.W.2d 659, 661.

appellate court properly may refer to an accompanying memorandum to explain or support the order [e. g., Ponyard v. Drexel, Mo.App., 205 S.W.2d 267, 270(3, 4)]; but the order presently under review is afflicted with none of those frailties.

■ The Authority was granted a new trial "on the grounds that the verdict of the jury is excessive and against the weight of the evidence," which are in legal contemplation and effect one and the same, namely, that the verdict was against the weight of the evidence.[2] Whatever was or might have been written in the memorandum opinion could not have become a part of that plain and unambiguous order or changed the meaning or effect thereof [Sawyer v. Winterholder, Mo., 195 S.W.2d 659, 661(2)] and could not have constituted a substitute for the order or been employed to oppose, contradict or dispute it. Bierman v. Langston, Mo., 304 S.W.2d 865, 867 (5). Being invested with no right to "go behind what is clearly expressed in the order" [State ex rel. State Highway Com'n. v. Vaught, Mo., 400 S.W.2d 153, 154], we accept it at face value as having granted a new trial on the sole specified ground that the verdict was against the weight of the evidence. Burr v. Singh, 362 Mo. 692, 699–700, 243 S.W.2d 295, 300(11); Mary Potter Love, Inc. v. Medart, Mo.App., 198 S.W.2d 386, 391(2). Accordingly, we eschew the unnecessary and unrewarding exercise of discussing the alleged "substantial or prejudicial misconduct and arguments" of JUD's attorneys or "the general attitude developed in connection with the trial."

■ *Of (a).* A preliminary review of the settled legal principles applicable upon appeals such as this may be helpful. The trial court is vested with broad and inherent discretion in granting one new trial on the ground that the verdict was against the weight of the evidence;[3] an order granting a new trial on that ground is presumptively correct;[4] and the appellate court will be liberal in upholding such order.[5] It has been declared repeatedly that "the granting of a new trial by the trial court [on the ground the verdict was against the weight of the evidence] will not be interfered with on appeal *where there is substantial evidence to sustain the trial court's view,* or, putting it in another way, when there is substantial evidence to support a verdict for the party to whom a new trial is granted."[6] (Except as otherwise indicated, all emphasis herein is ours.) Hence, stated in its simplest terms, our province on review is to ascertain whether there was substantial evidence to support the trial court's

2. Wessels v. Smith, Mo., 362 S.W.2d 577, 579(4); Underwood v. Brockmeyer, Mo., 318 S.W.2d 192, 193(1), 195(7); Combs v. Combs, Mo., 295 S.W.2d 78, 80(3); Bell v. Bell's Estate, Mo.App., 368 S.W.2d 544, 545(1); State ex rel. State Highway Com'n. v. Liddle, Mo.App., 193 S.W.2d 625, 629(1).

3. V.A.M.R. 78.01; V.A.M.S. § 510.330; State ex rel. State Highway Com'n. v. Klipsch, Mo., 414 S.W.2d 783, 786(1); Wessels, supra note 2, 362 S.W.2d at 579 (4); Andres v. Brown, Mo., 300 S.W.2d 800, 801(1); City of St. Charles v. De Sherlia, Mo.App., 308 S.W.2d 456, 459 (1).

4. Vaught, supra note 1, 400 S.W.2d at 155 (2); Weathers v. Falstaff Brewing Corp., Mo.App., 403 S.W.2d 663, 667(10); State ex rel. State Highway Com'n. v. Flynn, Mo.App., 263 S.W.2d 854, 856(2).

5. Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 568, 183 S.W.2d 140, 146 (15), 156 A.L.R. 469; Reichmuth v. Adler, 348 Mo. 812, 816, 155 S.W.2d 181, 182(1); Flynn, supra note 4, 263 S.W.2d at 856(3); Wormington v. City of Overland, Mo.App., 224 S.W.2d 590, 591(2); Schreiner v. City of St. Louis, Mo.App., 203 S.W.2d 678, 680(3).

6. Walsh v. Southwestern Bell Telephone Co., 331 Mo. 118, 131–132, 52 S.W.2d 839, 845; State ex rel. State Highway Com'n. v. Belvidere Development Co., Mo., 315 S.W.2d 781, 784; Dawson v. Scherff, Mo., 281 S.W.2d 825, 831; Overbey v. Fodde, Mo., 420 S.W.2d 510, 511(1); Vaught, supra note 1, 400 S.W.2d at 155; Robinson v. Wampler, Mo., 389 S.W.2d 757, 760; State ex rel. State Highway Com'n. v. Hutchison, Mo.App., 404 S.W.2d 391, 393.

order.[7] And in such inquiry we should look to the evidence most favorable to sustention of that ruling,[8] disregarding the testimony favorable to JUD unless it aids the successful movant, i. e., the Authority.[9]

We particularly note the holdings in certain condemnation cases recognizing and applying the foregoing principles, to wit, (a) that on condemnor's appeal from an order granting a new trial to condemnee because a verdict of "no damages" was against the weight of the evidence, the appellate court only determines "whether there is any substantial evidence to support a verdict of some net damages to the landowners, and if so the trial court's ruling is not to be disturbed" [Vaught, supra, 400 S.W.2d at 155(5)], and (b) that, on condemnor's appeal from an order granting a new trial to *condemnee* because a verdict of $1,350 was against the weight of the evidence, the trial court had discretionary power to grant such new trial "if there was substantial evidence in the case to support a verdict in a *larger* amount than that awarded by the jury." State ex rel. State Highway Com'n. v. Hutchison, Mo.App., 404 S.W.2d 391, 393(2). By the same reasoning it logically follows, and we so hold, that in the case at bar the trial court had such discretionary power to grant a new trial to *condemnor* if there was substantial evidence in the case to support a verdict in a *smaller* amount than the jury's award of $5,000.

With these controlling legal principles before us, we turn to the evidence. The subject lots, each 50 feet in width, fronted for 100 feet on the east side of South Pennsylvania Avenue between Second and Third Streets and had a depth of 130 feet including 10 feet at the rear which was one-half of the vacated alley. They sloped downgrade toward the east, with a fall of 3½ to 4½ feet between the front and the rear of the lots. At the rear, the ground level dropped "immediately and rapidly, perhaps 25–30 feet down to what was Kentucky Avenue," the first north-south street east of Pennsylvania. The freight house and tracks of JUD, a corporation "owned" jointly by three railroads, namely, the Kansas City Southern, Santa Fe and Missouri-Kansas-Texas, were on this lower level in the block east of Kentucky. Either JUD or its subsidiary, Union Depot Realty Company, had owned the subject lots since 1908. Witness McCright, general tax commissioner and real estate agent for the Kansas City Southern which operated JUD for the three joint owners, said that the subject lots had been vacant and undeveloped and had not been "used * * * for anything" since 1943, when he first saw them; and there was no showing of any structure thereon or any use thereof at any prior time.

Pennsylvania Avenue, with a 38–foot blacktop roadway, was the second street east of Main Street, the principal north-south street through the downtown business district of Joplin. One of JUD's witnesses located "the 100% area of downtown Joplin" as on Main Street between Fifth and Sixth Streets, some five to six blocks from the subject lots. However, the east side of Main Street between First and Fourth Streets was included with the subject lots

7. Vaught, supra note 1, 400 S.W.2d at 155(5); Belvidere Development Co., supra note 6, 315 S.W.2d at 785(8); Liddle v. Collins Construction Co., Mo., 283 S.W.2d 474, 477(1); Wilhelm v. Haemmerle, Mo., 262 S.W.2d 609, 613(8); Flynn, supra note 4, 263 S.W.2d at 856(5); Bell, supra note 2, 368 S.W.2d at 545(4).

8. Vaught, supra note 1, 400 S.W.2d at 155(5); Overbey, supra note 6, 420 S.W.2d at 511; Underwood, supra note 2, 318 S.W.2d at 194(5); Bierman, supra note 1, 304 S.W.2d at 868(9); Stith v. St. Louis Public Service Co., 363 Mo. 442, 454, 251 S.W.2d 693, 700(14), 34 A.L.R. 2d 972; Steuernagel v. St. Louis Public Service Co., 361 Mo. (banc) 1066, 1075, 238 S.W.2d 426, 431–432(13); Flynn, supra note 4, 263 S.W.2d at 856(6).

9. Cox v. Harris, Mo., 400 S.W.2d 190, 192(2); Madsen v. Lawrence, Mo., 366 S.W.2d 413, 416(6); Kiburz v. Loc-Wood Boat & Motors, Inc., Mo., 356 S.W. 2d 882, 885(4). See Burks v. Leap, Mo., 413 S.W.2d 258, 263(1).

in the same "blighted" area which the Authority was seeking to redevelop in the Progress Urban Renewal Project; and even JUD's witnesses did not think that the subject lots should be valued for "possible retail use."

Upon trial four witnesses, three for JUD and one for the Authority, gave opinion evidence concerning the fair market value of the subject lots as of May 12, 1964, the date of taking. No objection was interposed to the opinion evidence of any, excepting only JUD's witness McCright, and that objection was overruled. The focal point of disagreement, which largely accounted for the relatively wide spread between the valuations offered by JUD's witnesses and that submitted by the Authority's witness, was as to the highest and best use of the subject lots. JUD's three witnesses steadfastly asserted that use was *light industrial*, while the Authority's witness just as persistently maintained it was *residential*. On the former premise, JUD's witness McCright expressed the opinion that the fair market value of the subject lots was $6,500, JUD's witness Swanson placed that value at $6,000, and JUD's witness McAllister at $5,000. On the latter premise, the Authority's witness Kelly gave his opinion of fair market value as being $1,500.

JUD's witnesses emphasized that the subject lots were in an area zoned "F" in which light industrial uses were permitted, pointed out that the surrounding neighborhood was "one of the older areas of Joplin" and had developed "an unsavory reputation" by reason of the indulgence of easy virtue in some habitations, and relied heavily upon two so-called "comparables," to wit, (1) the sale of Lot 94 at Third and Virginia, about 1½ blocks southwest of the subject lots, to the Joplin Globe Publishing Company in 1960 for $5,500, and (2) the sale of Lots 176 and 177 at Fifth and Kentucky, about 3½ blocks southeast of the subject lots, to Empire District Electric Company in 1954 for approximately $9,500.

The Authority's witness Kelly said that neither of those "comparables" was a "true market sale," in that (1) Lot 94, only one block distant from the publishing plant of the Joplin Globe, was purchased to satisfy that firm's "definite need" for a nearby parking lot for its employees, and (2) Kelly's firm, employed by Empire District to negotiate purchase of Lots 176 and 177, had been instructed by that company to acquire "these particular lots" for erection of a substation—"they pick a specific location because it serves a definite need for them."

All other property sales in the vicinity of the subject lots, with one exception, had been for residential use. That single exception was the sale of Lot 106, a vacant lot on the southwest corner of Second and Pennsylvania and thus cater-cornered across Pennsylvania to the north of the subject lots, which were the second and third lots south of Second Street on the east side of Pennsylvania. In 1959 the City of Joplin purchased Lot 106 for $900 to be used as a parking lot for employees of the city garage located on the north side of Second Street. Witness Kelly also testified concerning three sales for residential use, to wit, (1) the sale of Lot 150, immediately south of the subject lots, in 1956 for $2,750, of which the witness "allowed" $2,000 for the "two-story frame dwelling in rather poor condition but * * * modern" (thereafter remodeled by the purchaser into "a very livable home") situate on that lot and $750 for the land, (2) the sale of Lot 147 on the southeast corner of Third and Pennsylvania, less than one block south of the subject lots, in 1958 for $3,250, that lot having been improved with two one-story frame dwellings "in need of general repair" but "livable and * * * lived in," and (3) the sale of Lot 174 at 410 Kentucky, about three blocks southeast of the subject lots, in 1959 for $3,100, that lot having been improved with a large two-story frame dwelling "of fair construction and in fair repair" and a small one-story frame dwelling "in a rather poor state of repair." Readily granting that real estate in that area was not in demand "for *desir-*

*able* residential purposes," witness Kelly insisted that nevertheless its highest and best use was for residential purposes, because "people in certain circumstances require shelter and they will buy it at the most reasonable price they can obtain and that is what they are buying here is reasonable shelter at the least possible cost."

With respect to possible industrial usage, the Authority's witness Kelly stated that there had been no new industrial construction in the vicinity of the subject lots for 25 years and that "all new construction has been out on the edge of town" because "industry wants out where they can have large acreages, lots of room for expansions, for truck deliveries and shipments." Furthermore, *this is a trend that is here to stay I think.*" Countering the suggestion of JUD's witness Swanson that the subject lots would be "a nice location" for a warehouse, witness Kelly called attention to the fact that a large quonset type warehouse situate alongside railroad tracks a short distance north of the subject lots had been vacant for 10 or 12 years with a "for sale or lease" sign on it, and also voiced the self-evident truth that "location has a tremendous influence upon values of property; I don't care how suitable it is, if it's in the wrong location it loses its value." In sum, this witness declared "there's no indication in the market or in the neighborhood that I could find that anybody would want [the subject lots] for industrial use." At this point, it may not be inappropriate to note first the "thought" of JUD's witness Swanson that "this whole area was not being utilized to its fullest extent" and that it *"should be* developed as an industrial [area]," and then his ready concessions that it had not been so developed, that "there has to, of course, be a demand before you have use for it," and that there was no such demand at the time.

Generally speaking, compensation to a condemnee " 'is to be estimated by reference to the uses for which the property is suitable, *having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future.*'" Union Electric Co. v. McNulty, Mo., 344 S.W.2d 37, 40(4); Mississippi and Rum River Boom Co. v. Patterson, 98 U.S. 403, 408, 25 L.Ed. 206, 208. " 'There must be some probability that the land would be used within a reasonable time for the particular use to which it is adapted. The adaptability of the land for a particular purpose is immaterial unless the present market value is enhanced thereby. There must be a present demand for the land for such purpose or a reasonable expectation of such demand in the near future.'" Union Electric Co., supra, 344 S.W.2d at 40; 29A C.J.S. Eminent Domain § 160, l.c. 685–688. See Northeast Missouri Electric Power Coop. v. Todd, Mo.App., 401 S.W.2d 161, 163–164(3, 4); 27 Am.Jur.2d Eminent Domain § 280, p. 70.

Certainly, a submissible issue was presented as to whether the highest and best use of the subject lots was residential or light industrial. It is true that, as JUD emphasizes, it was the province of the jury, in the first instance, to decide upon the believability of the evidence and its weight and value [MAI No. 2.01; State ex rel. State Highway Com'n. v. Williams, Mo., 289 S.W.2d 64, 66(3)], but it is equally true that, in the exercise of the important function of determining whether a new trial should be granted for excessiveness of the verdict, the trial judge was invested with the right and charged with the duty to consider and weigh the evidence and, in so doing, to accord to the testimony of the respective witnesses such weight and value as in his opinion should have been given thereto.[10]

10. *Belvidere Development Co., supra note* 6, 315 S.W.2d at 784(2, 4, 6); Combs v. Combs, Mo., 295 S.W.2d 78, 80(4); Sanders v. Illinois Central R. Co., 364

JUD's counsel argue that "it becomes self-evident the [trial] court did not judicially *weigh* the evidence presented by the witnesses" but that "he acted arbitrarily upon his prior and personal predilections," for "otherwise the evidence of *one witness* for condemnor could not conceivably constitute the *weight of the evidence* against the contrary testimony of *three expert witnesses* whose opinions were fully supported by the evidence." (Emphasis by counsel) And at the close of an earnest and elaborate presentation, counsel asseverate that "we have demonstrated herein that the jury verdict for $5,000 * * * was a fair, rational and just result. Certainly it was supported by the greater number of witnesses—three to one—also by the established zoning classification. * * * The trial judge, therefore, could not have, and did not, weigh the record evidence, but rather acted upon his personal predilections." Notwithstanding counsel's qualified oral disclaimer ("that's not necessarily true"), JUD's appellate position depends upon the fallacious doctrine that the weight of the evidence should be equated with the greater number of witnesses produced. Illustrative of that was the suggestion of JUD's counsel in oral argument that, if the testimony of JUD's witness McCright and the Authority's witness Kelly were set aside and disregarded entirely because (so counsel opined) both might be interested in the outcome and biased (McCright because of his position with and long employment by JUD's controlling corporate parent and Kelly because he had been employed by the Authority for some six months in making initial appraisals of all properties to be acquired in the Progress Urban Re-

newal Project), JUD would be left with the testimony of its other two witnesses and thus the clear weight of the testimony. But a trial at law is not a game of checkers in which witnesses called by the contending parties may be treated as men to be traded off, one for another, until one party is left with no men and the other, with men still untraded, is declared the victor. When courts speak of the weight of the evidence, they mean its weight in probative value, not the quantity or amount thereof. O'Shea v. Pattison-McGrath Dental Supplies, 352 Mo. 855, 864, 180 S.W.2d 19, 23(10); Reis v. Taylor, Mo.App., 103 S.W 2d 892, 899. See State v. Madole, 347 Mo. 575, 579, 148 S.W.2d 793, 794. "The weight of evidence is not a question of mathematics, but depends on its effect in inducing belief." Braunschweiger v. Waits, 179 Pa. 47, 36 A. 155, 156.

The Authority's witness Kelly was shown to have had an impressive background and extensive experience as an appraiser, and his status as an expert qualified to give opinion evidence concerning the highest and best use of the subject lots and the fair market value thereof at the time of taking was not in the trial court, and is not here, challenged. His testimony undoubtedly constituted substantial evidence which would have justified and supported a verdict in a sum materially less than $5,000.[11] Since there was substantial evidence to sustain the trial court's view [see Vaught, supra, 400 S.W.2d at 155(5); Hutchison, supra, 404 S.W.2d at 393(2); and other cases cited marginally in notes

---

Mo. 1010, 1019, 270 S.W.2d 731, 737 (6); Wilhelm, supra note 7, 262 S.W.2d at 612–613(6); Steuernagel, supra note 8, 361 Mo. at 1075, 238 S.W.2d at 431 (11); Moore v. Glasgow, Mo.App., 366 S.W.2d 475, 482(8).

11. State ex rel. State Highway Com'n. v. Eilers, Mo., 406 S.W.2d 567, 575(17); State ex rel. State Highway Com'n. v. Hamel, Mo., 404 S.W.2d 736, 739; Belvidere Development Co., supra note 6, 315

S.W.2d at 785(9); City of St. Louis v. Buselaki, 336 Mo. 693, 80 S.W.2d 853, 857(7); Kirst v. Clarkson Const. Co., Mo.App., 395 S.W.2d 487, 494–495; Union Electric Co. v. Simpson, Mo.App., 371 S.W.2d 673, 683; State ex rel. State Highway Com'n. v. Anderson, Mo.App., 367 S.W.2d 809, 811, 812; Empire District Elec. Co. v. Johnston, 241 Mo.App. 759, 268 S.W.2d 78, 83; Flynn, supra note 4, 263 S.W.2d at 856(7).

6 to 9, incl.], and since we have no right to reweigh or reevaluate the evidence here,[12] the order of the circuit court granting a new trial to condemnor on the ground that the verdict for $5,000 was against the weight of the evidence should be affirmed and the cause should be remanded to said circuit court for retrial.

It is so ordered.

HOGAN, P. J., and TITUS, J., concur.

12. Eilers, supra note 11, 406 S.W.2d at 575(16); Union Electric Co. v. McNulty, Mo., 344 S.W.2d 37, 39; Walsh, supra note 6, 331 Mo. at 131, 52 S.W.2d at 845; Parks v. Midland Ford Tractor Co., Mo. App., 416 S.W.2d 22, 26(5, 6); Bell, supra note 2, 368 S.W.2d at 545(6); Anderson, supra note 11, 367 S.W.2d at 811; Flynn, supra note 4, 263 S.W.2d at 856.